(80 N. W. Rep. 689.)

---

AUGUST BRUMMOND *et al vs.* ALBERTINE KRAUSE *et al.*

Opinion filed October 11, 1899.

**Cancellation of Deed—Fraud—Undue Influence.**

When a deed given by parents to their adult child is attacked for the alleged fraud of the latter in procuring it to be executed, and it appears that the parents were feeble from age as well as illiterate, and that a relation of confidence and trust existed between them by reason of their dependency on such child, the burden is upon the child to show the fairness of the transaction.

**Burden of Proof to Show Fair Dealing.**

It is not enough for one who has made a written contract with illiterate and infirm persons to show that the contract was read to them. It must also appear that they understood it and assented to it knowingly.

**Deed Void Between the Parties—Subsequent Mortgage Also Void.**

Under the facts stated in the opinion, showing that the deed executed by the plaintiffs to their daughter was for a grossly inadequate consideration, and that it was signed by them under the controlling influence of such daughter and her husband, and in ignorance of its nature and effect, and without negligence on their part, *held*, that such deed is void. *Held*, further, that the mortgage thereafter executed by the grantee and her husband is also void; it appearing that the mortgagee had full knowledge of the acts leading up to the execution of the deed and the means by wich it was obtained.

Appeal from District Court, Richland County; *Lauder*, J.

Suit by August Brummond and Louisa Brummond against Albertina Krause and others. Judgment for plaintiffs, and defendants appeal.

Affirmed.

*Chas. E. Wolfe* and *W. E. Purcell,* for appellants.

*Freerks & Freerks,* for respondents.

YOUNG, J. The plaintiffs seek in this action to annul and cancel a certain warranty deed executed by them on or about December 28, 1897, conveying 160 acres of land, situated in Richland county, to the defendant Albertina Krause; also to cancel and declare void a mortgage thereon executed by said Albertina Krause and John

Krause, her husband, in favor of Otto Latzky, the other defendant, to secure the sum of $300. The mortgage bears date December 30, 1897. Fraud on the part of the grantee and her husband in procuring the execution of the deed, and knowledge thereof and participation therein by Latzky, the mortgagee, are alleged as the basis of the relief sought. The trial court found for the plaintiffs, and a decree was ordered and entered declaring both the deed and mortgage void, and quieting title in the plaintiffs. The case is here for trial anew upon defendants' appeal, and involves only a retrial of fact issues. Our determination of the facts from the printed evidence does not differ essentially from the findings of the trial judge, and our conclusion is that the decree canceling both the deed and the mortgage, and declaring them void, was proper.

August Brummond and Louisa Brummond, the plaintiffs herein, are husband and wife. Both are Germans. Neither can write, read, or speak the English language. August Brummond is 74 years old, and his wife is 66. They came to this country about 14 years ago. In 1892, August Brummond filed a homestead entry upon the land in question. Since that time, and up to the execution of the deed, it was occupied by him and his wife as their home. Final proof was made in August, 1897, under the homestead laws of the United States, and final receiver's receipt issued. Albertina Krause, the grantee, is plaintiffs' daughter. She, with her husband, John Krause, lived upon an adjoining claim, which was not proved up when the deed in question was executed. Their houses were little more than 50 feet apart. During the several years they lived there the two families appear to have aided one another in various ways. For instance, the son-in-law assisted the plaintiff in making his filing, also his final proof, and seems to have advanced the money to pay the fees. He also helped build the little shanty in which the old folks lived, and broke up and brought under cultivation a large portion of their land. On the other hand, the services of the plaintiffs were always at the command of the defendants, and were frequently called for; Mrs. Brummond assisting her daughter in her housework and in the care of her children, and her husband laboring in the fields. They also permitted the defendant Krause to crop and use their land as his own. Generally speaking, their business dealings were conducted in a manner usual to those similarly related,— without definite agreements or settlements. The relation of the parties was not only one of trust and confidence, but, on account of the illiteracy, ignorance, and mental and physical infirmities incident to their advanced years, plaintiffs were entirely dependent upon their daughter and her husband for guidance in all their affairs. It is clear from the evidence that the conduct of the daughter towards her aged parents was always unfilial, domineering, and even brutally cruel. Threats against the life of her parents were of frequent occurrence, and at times her vicious disposition vented itself in blows upon her mother. So, too, the daughter seems to have had the steadfast desire of getting the deed to this land, from the time her

father filed upon it, notwithstanding it was all the property her father and mother had to support them for the rest of their lives, and in face of the fact that they had seven other children then living. The fact that plaintiffs continued to live in this condition of dependency, as the evidence shows they did, and to serve their daughter and her husband for so many years, is not to be attributed to choice, but to their helplessness to do otherwise. The defendant Otto Latzky held Krause's note, secured by chattel mortgage upon the horses and chattels with which he (Krause) operated his own and plaintiffs' land, and was pressing for payment. Krause had no other property upon which he could either further secure Latzky, or upon which to borrow money to pay him, and this was known to Latzky. In November, 1897, with Latzky's knowledge, Krause and his wife negotiated with an attorney in Wahpeton for a $400 loan, to be secured by a mortgage to be executed by plaintiffs upon their land, the notes to be guaranteed by the Krauses. This was for the purpose of getting money to pay Latzky. The mortgage and notes for this loan were executed by plaintiffs under the influence, as we think, of statements by the defendants that, if not done, the horses and machinery would all be taken away from the farm. For some reason the attorney of the mortgagee declined to complete the loan, and the papers were returned to the defendant Krause, who then had the same attorney prepare a warranty deed to the land in which his wife was named as grantee, ready for plaintiffs' signatures. A typewritten contract was also prepared, bearing date December 20, 1897, wherein these plaintiffs acknowledged the receipt from the Krauses of $618, as theretofore paid to them in the form of money, labor, and goods, in consideration for which, and an agreement to furnish a certain yearly support, it was recited that they had conveyed to Albertina Krause the land in question. Defendants, on their part, agreed in said contract to deliver to plaintiffs during their lifetime, and yearly, $25 in cash, 25 bushels of potatoes, 500 pounds of flour, 3 cords of wood, and 1 hog. The plaintiffs had nothing to do with the negotiations for the mortgage loan or the preparation of this deed and contract. Neither of them was in Wahpeton. The mortgage was signed and acknowledged at their house before a notary public sent there for that purpose. The entire business was conducted by the Krauses, and the data for drawing the contract was furnished to the attorney by them. Latzky, in the meantime, apparently assured that he was to get the proceeds of the $400 loan which was being negotiated upon the plaintiffs' land or security thereon, running to himself, appears to have bought certain other outstanding claims against the Krauses and added them to those already held by him. Among these was a store account of Hunger & Co., dealers in general merchandise in Hankinson. Latzky was a member of this firm. The failure to get the $400 loan led to the preparation by defendants, and subsequent execution by plaintiffs, of the deed which is here attacked. John Krause, upon his return from Wahpeton with the deed and contract which had been pre-

pared, took the plaintiffs to Hankinson, to the store of Hunger & Co., where both instruments were signed by the old people in the presence of F. O. Hunger, Latzky's partner, and his father, Ed. Hunger, who witnessed the signatures. F. O. Hunger was a notary public, and took their acknowledgment to the deed. Krause left the deed with Hunger at the store, and, after taking the old folks home, returned to the store with his wife, two days later, and before the same notary, they gave the note to Latzky for $300, and also executed a mortgage upon this land to him, securing it. The note and mortgage were prepared by the notary public from data handed to him by his partner, the defendant Latzky. The deed and mortgage were taken charge of by Hunger, and were sent for record together, and were recorded on January 3, 1898.

Before referring to the question whether there was fraud or deception practiced upon the plaintiffs by the Krauses to secure the execution of the deed, and of such a nature as to avoid it, we will say that the evidence gives no support to the contention that Latzky is an innocent purchaser, and, as such, is entitled to have his mortgage upheld, regardless of the result of our finding as to the deed. He had a personal interest in the execution of the deed, and his personal knowledge, we think, extended to all important acts done, up to and including its execution. The trial court found that Hunger, who acted as conveyancer and notary, was present, and acted at the request of, and "as agent for, Latzky in reference to such conveyance." This finding has abundant support in the evidence. It is also evident to us that Latzky had personal knowledge of all that was being done. Under this state of facts, his mortgage must stand or fall with the deed.

Enough has been said to show that a relation of trust and confidence existed between the grantors and the grantee,—the relation of parent and child; not in this case the child yielding to the superior will of the parent, but of aged and ignorant parents, almost wholly dependent upon the child for guidance in their affairs. Indeed, the evidence shows that the only business ever transacted by this aged couple was the filing and proof on this land and the signing of the mortgage, and that these acts were under the direction of their daughter and her husband. *Highberger* v. *Stiffler,* 21 Md. 338, is somewhat similar in its facts. The Court said: "The natural relation of the parties was reversed in this instance by the influence of time. The parent had become a child, and the child was guardian to the parent. The same dependence, overweening confidence, and implicit acquiescence which rendered one an automaton in the hands of the other existed, —'*Et ubi eadem ratio, ibi idem jus.*' The wish of the agent had become the will of the principal. Whatever the former suggested, the latter executed. There was no consent of two minds, but a merger of the principal's mind in the mind of the agent." It is a well-settled principle that contracts between persons occupying such relations will be carefully watched by courts of equity, and will be set aside where the stronger mind has induced

it to be made, unless the bona fides of the transaction is shown. Kerr, Fraud. & M. 150-152; *Leighton* v. *Orr,* 44 Iowa, 679; *Tucke* v. *Buchholz,* 43 Iowa, 415; *Gardner* v. *Lightfoot,* 71 Iowa, 577, 32 N. W. Rep. 510; *Thorn* v. *Thorn,* 51 Mich. 167, 16 N. W. Rep. 324.

Can this deed be upheld, under the evidence and the foregoing principle? We think not. What was the consideration for the deed? The contract which the Krauses had drawn in Wahpeton recites it to be $618 formerly had by the grantors, and an agreement for their support during their lives. This item of $618 had existence merely on paper. The plaintiffs owed no such sum. Neither had that or any other sum been agreed upon or talked about as due the Krauses. No demand was ever made upon plaintiffs for payment, or intimation given them that the Krauses claimed they owed them. The agreement for support, then, is the only consideration for the deed, and that, in our view is unconscionably· inadequate. The land was found by the trial court to be worth $1,200. On it plaintiffs had their home. For this they received only the unsecured promise of the daughter and son for $25 cash, 25 bushels of potatoes, 500 pounds of flour, 3 cords of wood, and 1 hog each year, with the proviso that the foregoing is to be cut in two in case one of them should die. This annual allowance is not even adequate compensation for the use of the land, saying nothing of it as consideration for a·transfer of the title. So, too, the allowance of the small sum of $25 in cash to provide the various necessities of this aged couple, and the provision of but 3 cords of wood for summer and winter fuel, is grimly suggestive that the death of these old people would very soon end defendants' obligation to provide even these niggardly items. Not only do we consider this unsecured agreement for support grossly inadequate consideration for the deed, but we are also convinced that the plaintiffs were deceived as to the character and nature of the instrument signed. It is true they were read to them by the notary in their own language. With persons of ordinary intelligence, this would be sufficient, but is not under the facts as they here appear. *Selden.* v. *Myers,* 20 How. 506. An actual understanding of the meaning of the instrument must appear before there can be a binding assent. As well might a claim of knowledge of the contents of a written instrument be based upon proof that it was exhibited to one who was blind, or read to one who was deaf, as to rely upon an interpretation thereof to persons who, from mental infirmity and dense ignorance, are not able to understand its meaning. Plaintiffs say that they understood they were making papers providing for their old age, and nothing more, and that this understanding came from what the defendants had said to them, and from what Hunger explained to them in the store, and that they did not know they were deeding the land away. Every circumstance tends to satisfy us that these statements are true. It is not conceivable that plaintiffs would willingly and knowingly part with the

title to this land, which was their all, not even reserving a place to live, and to this daughter, whose cruelty they had felt, for the unsecured pittance which the contract promised them. We not only find that the consideration was grossly inadequate, but, further, that the plaintiffs did not understand the nature and effect of the deed, and that their signatures thereto were obained through the controlling influence of their daughter and her husband, by misrepresenting and concealing its true character as an absolute conveyance, and that the defendant Latzky had entire knowledge of the manner in which the deed was obtained, and that it was without consideration. A court of equity will not permit such a transaction to stand. The judgment of the District Court is in all things affirmed. All concurr.